<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| J&S GROUP INC., WANAQUE REALTY CORP., and MOUNTAIN LAKES ESTATES, INC., <br><br>       *Plaintiffs*, <br><br>       v. <br><br> BOROUGH OF WANAQUE, <br><br>       *Defendant*. | Civil Action No. 18-14817 <br><br> **OPINION** <br><br> August 12, 2025 |

**SEMPER**, District Judge.

    **THIS MATTER** comes before the Court on Defendant Borough of Wanaque's ("Defendant" or the "Borough") motion for summary judgment. (ECF 123, "Mot.") Plaintiffs J&S Group, Inc., Wanaque Realty Corp., and Mountain Lakes Estates, Inc. (together "Plaintiffs") filed a brief in opposition to the motion. (ECF 130, "Opp.") Defendant filed a reply brief. (ECF 134, "Reply".) The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons stated below, Defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

    **I.**    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]**

---

[1] The facts and procedural history are drawn from Defendant's brief in support of its motion for summary judgment (ECF 123), Plaintiffs' brief in opposition (ECF 130), Defendant's brief in reply (ECF 134), and the parties' submissions regarding undisputed material facts (ECF 123-1, "DSMF"); (ECF 130-1, "PSMF").

The present lawsuit relates to a dispute over the development of land in the Borough of Wanaque.  Plaintiffs are affiliated companies that own adjacent tracts of land in Wanaque, New Jersey.  (ECF 130-2, "Rodrigues Cert." ¶ 2.)  Plaintiffs acquired these properties for the purpose of real estate development, with the intent to construct and sell townhomes and single-family homes for profit.  (*Id.*)  In 2000, Defendant and Plaintiffs signed two Developer's Agreements in connection with Wanaque Planning Board approvals for a 47-unit townhouse development project ("Lakeside Manor") and a 128-unit single family home development project ("Mountain Lakes Estates").  (DSMF ¶ 2.)

Plaintiffs secured the requisite permits and approvals from Defendant and began to develop the property. (PSMF ¶ 2.)  Plaintiffs completed one six-unit townhouse, but for the interior sheetrock finishing, as well as three single family homes that they allege were between ninety and one hundred percent completed.  (*Id.* ¶ 3.)  Plaintiffs also constructed foundations for a second six-unit building and performed the necessary grading and blasting to construct foundations and install utilities for the remaining buildings.  (*Id.*)  Plaintiffs spent around $1 million on site preparation and construction, including building a main access road and arch bridge for the Lakeside Manor project.  (*Id.* ¶ 4.)  Plaintiffs also constructed a loop road for entry and exit for the Lakeside Manor townhomes, as well as sidewalks, gas and electric, and a sewer line.  (*Id.*)  Plaintiffs claim that because of their installation of water main extensions, neighboring homes gained access to public water.  (*Id.*)  Plaintiffs partnered with Kara Homes to build and market the homes, and the total value of their contract with Kara Homes approximated $50 million.  (*Id.* ¶ 5.)

On September 16, 2004, the Borough issued a stop work order after the New Jersey legislature passed the Highlands Water Protection and Planning Act (the "Highlands Act") which designated certain areas to the Department of Environmental Protection ("DEP") to preserve New

Jersey's fresh waters. (DSMF ¶¶ 10-11; *see* N.J. Stat. Ann. 13:20-1, *et seq.*) Plaintiffs sought an exemption, but DEP declared Plaintiffs' properties non-exempt on September 4, 2009. (DSMF ¶¶ 12-13.) Plaintiffs appealed this decision, and on August 1, 2011, the Superior Court of New Jersey, Appellate Division ruled that the properties were exempt from the Highlands Act. (*Id.* ¶ 13.)

For various reasons, Plaintiffs did not resume construction on the properties after they won their appeal, and on October 6, 2014, the Council of Wanaque unanimously adopted Resolution 173-0-14 declaring the Plaintiffs' Developer's Agreements in default. (*Id.* ¶ 16.) The next day, Plaintiffs filed suit in the Superior Court of New Jersey seeking to enforce the Developer's Agreements. (*Id.* ¶ 17.) The parties resolved the state court litigation on December 8, 2014 and entered into a Settlement Agreement. (*Id.* ¶¶ 19, 20.) On July 16, 2016, the Borough adopted Ordinance 15-0-16 declaring Lakeside Manor as a condemned area in need of redevelopment. (*Id.* ¶ 22.)

On February 27, 2017, Plaintiffs entered into a contract with a prospective developer, J&J Builders, to sell the properties to J&J for redevelopment in accordance with the Developer's Agreements. (ECF 108, Amended Complaint, "Compl." ¶ 83; DSMF ¶ 25.) Plaintiffs allege that the Borough refused to assign the Developer's Agreements to J&J Builders, and on April 3, 2017, J&J cancelled its contract with Plaintiffs. (Compl. ¶¶ 91, 93.) Plaintiffs allege that the Borough was "uncomfortable" with J&J Builders and refused to consider permitting the assignment of the Developer's Agreements to them because J&J's owner, Jose Gomes, is an immigrant of Portuguese descent. (*Id.* ¶ 90.) Jacinto Rodrigues, the owner of Plaintiff companies, is also an immigrant of Portuguese descent. (*Id.*) Mr. Rodrigues testified that Thomas Carroll, the Wanaque Borough Administrator, told Mr. Rodrigues: "We don't want this guy [Gomes] to build the project, and the Town doesn't want you. Sell the project. Get somebody else. We are not—we don't want you or

your Portuguese friends to come and build the project in Wanaque. You're not welcome." (ECF 130-4, "Rodr. Dep.", 84:7-13.)

On July 13, 2017, the parties entered into an Amended Settlement Agreement "to resolve existing disputes" between them. (DSMF ¶ 31.) The Amended Settlement Agreement acknowledged the continued validity and force of the Developers' Agreements with respect to both Mountain Lakes Estates and Lakeside Manor, but new work permits were required to continue construction on the properties. (PSMF ¶ 33.) On November 27, 2017, the Borough's Code Official denied the construction plans Plaintiffs submitted on November 3, 2017 for failure to comply with the Uniform Commercial Code. (DSFM ¶ 43.) On December 20, 2017, the Borough Attorney gave notice to Plaintiffs that their prior approvals from 2000 were declared void by virtue of the Plaintiffs' failure to receive a building permit within 150 days from the completion of the Planning Board review, as agreed upon in the Amended Settlement Agreement, though the parties dispute the application of this term from the agreement. (*See id.* ¶ 46; PSMF ¶¶ 53-55.) On December 21, 2017, the Code Official issued a stop work order for the Lakeside Manor development. (DSFM ¶ 47.) Plaintiffs appealed the issuance of the stop work order to the Passaic County Construction Board of Appeals, and at a hearing before that Board on January 18, 2018, the parties agreed that Defendant would review revised plans submitted for the Lakeside Manor project. (*Id.* ¶¶ 49, 50.)

On March 9, 2018, the Borough Attorney advised Plaintiffs that they "did not submit satisfactory plans." (*Id.* ¶ 52.) On May 28, 2018, the parties appeared again before the Passaic County Board of Appeals, and the Borough Code Official stated that he had been instructed by counsel for the Borough not to issue a work permit since the deadline for obtaining such a permit had expired. (*Id.* ¶ 53.) Plaintiffs commenced this suit in federal court on October 10, 2018. (*See* ECF 1.)

Plaintiffs do not dispute that since they stopped construction on the properties in 2004, the "partially constructed structures remained unused and vacant and became increasingly dilapidated and unsightly." (DSMF ¶ 57.) Mr. Carroll, the Borough Administrator from 1995 through 2017, testified that the Plaintiffs' properties were subject to continuous complaints from residents due to their dangerous and hazardous condition. (*Id.* ¶ 56; ECF 123-8, "Carroll Dep.", 16:17-22, 17:15-21, 76:24-78:8.) It remains undisputed that since 2004 neighboring homeowners have lodged various complaints with the Borough regarding the condition of the properties, including unsafe road conditions, incomplete infrastructure, drainage problems, and dilapidated structures, all of which reduced the value of their homes. (DSMF ¶ 58.)

Plaintiffs allege that "from Day 1" Defendant gave Mr. Rodrigues "a hard time every opportunity they had" due to his immigrant background, and that the Borough's refusal to transfer the Developer's Agreements to J&J Builders, as well as Mr. Carroll's derogatory comments about Portuguese people, solidified this belief. (PSMF ¶ 61; Rodr. Dep., 81:19-82:9.) Mr. Rodrigues testified that they did not treat him "equal like anybody else…They always treat me in some way that we don't belong there" and that at meetings with the Borough, "they make me feel inferior, yes." (*Id.* 81:19-82:9; 83:8-84:5.)

On March 11, 2021, the Borough canceled the stop work order. (DSMF ¶ 61; *see* ECF 123-9, "Ex. HH".) Mr. Rodrigues testified that he has taken no action to further develop the properties after the stop work order was rescinded because of the existence of the instant litigation. (DSMF ¶ 62; Rodr. Dep., 108:22-110:4.) Mr. Rodrigues further testified that nothing is preventing Plaintiffs from selling the properties, except the potential impact on their value as a result of the present litigation. (DSMF ¶ 63; Rodr. Dep., 125:14-25.)

Plaintiffs provide an expert report prepared by the Otteau Group, which valued the property at $2,943,485 as of December 21, 2017. (ECF 123-10, "Ex. JJ".) That expert report estimated the anticipated value of the property to be $17,196,00 if Plaintiffs had completed construction of Lakeside Manor and Mountain Lake Estates, and thus Plaintiffs could have realized profits of $12,976,275. (*Id.*) Defendant provides an expert report from Nationwide Consulting Company, which determined the value of the Plaintiff properties as of December 21, 2017 was $3,760,000, and that the value of the properties as of March 24, 2024 was $5,200,000. (DSMF ¶¶ 66-67; *see* ECF 123-10, "Ex. KK".)

The parties attempted to resolve this matter in mediation, which began on January 10, 2019 before the Honorable Garrett E. Brown, Jr. (DSMF ¶ 68.) The parties engaged in extensive settlement negotiations over the course of three years, and mediation continued until August 19, 2022, when Plaintiffs' counsel informed this Court that the parties were unable to reach a settlement agreement and planned to continue towards trial. (DSMF ¶ 69; *see* ECF 68.)

On April 22, 2024, Plaintiffs submitted an Amended Complaint. (ECF 108.) Plaintiffs assert three claims against Defendant: an unconstitutional taking of Plaintiffs' property rights without just compensation in violation of the Takings Clauses of the Fifth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983 (Count I); a violation of the Fair Housing Act, 42 U.S.C. §3601 (Count II), and a violation of the Civil Rights Act, 42 U.S.C. §§ 1982, 1983 (Count III). (*Id.* ¶¶ 119, 122, 129.) On January 31, 2025, Defendant moved for summary judgment on all three counts of the Amended Complaint. (ECF 123.) Plaintiffs opposed the motion (ECF 130), and Defendant filed a reply (ECF 134)[2].

---

[2] Defendant submitted overlength briefs in support of its motion and reply, and after submission asked this Court to waive the page limitations of Local Rule 7.2(b). (*See* ECF 135.) Plaintiffs' opposition conforms to the page limits set forth in the Local Rules. Though Plaintiffs notified

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact [and] the moving party is entitled to a judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot

---

Defendants that their briefs exceeded the page limits, Plaintiffs did not object to Defendant's overlength briefs and "agree with Defendant that its motion implicates a lengthy and complicated set of facts." (ECF 136.) In light of the foregoing, the Court waives the page limit requirements of Local Rule 7.2 and considers all papers submitted in support of the motion.

forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

## III.    ANALYSIS

### A.  Takings Clause of the Fifth Amendment

Plaintiffs contend that genuine issues of material fact exist that make summary judgment inappropriate based on the loss of economically viable use of their property. (*See* Opp. at 29-34.) Defendant argues that Plaintiffs cannot establish a *per se* or any other form of regulatory taking because Plaintiffs can still sell, lease, and develop their property, and because Defendant has a legitimate interest in being able to modify its land use regulations. (*See* Mot. at 25-43.)

The Takings Clause, as incorporated against the states by the Fourteenth Amendment, guarantees that no "private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause not only applies to the government's physical appropriation of private property for public use, but also to government regulation that deprives the owner of the economically beneficial or productive use of his property. *Murr v. Wisconsin*, 582 U.S. 383, 384

(2017).  A regulation may be deemed a "regulatory taking" if considered overly burdensome.  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

The Supreme Court recognizes two types of regulatory takings.  First, a *per se* taking, which occurs when a regulation renders the property "essentially idle."  *Nekrilov v. City of Jersey City*, 45 F.4th 662, 670 (3d Cir. 2022) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)).  Such regulatory taking "denies all economically beneficial or productive use of land" and requires compensation under the Takings Clause.  *Murr*, 582 U.S. at 384 (quoting *Palazzolo v. Rhode* Island, 533 U.S. 606, 617 (2001).  Second, a less than total deprivation limiting the property's use may amount to a compensable taking under the test established in *Penn Central Transportation Company v. City of New York*.  438 U.S. 104, 124 (1978).  The *Penn Central* factors include: (1) the economic impact of the regulation on the value of the property; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action.  *Nekrilov*, 45 F.4th at 672 (quoting *Murr*, 582 U.S. at 393.)

Plaintiffs argue that they have been "deprived of all economically viable use of [their] property" because Defendant has prevented Plaintiffs from completing construction in accordance with the Developer's Agreements.  (Opp. at 32.)  The record does not support Plaintiffs' assertion of such a *per se* taking.  Plaintiffs still maintain economically viable use of the property, which retains significant value: Defendant's expert report indicates that the value of the property as of March 24, 2024 was $5,200,00, and Plaintiffs do not rebut this evidence.  (PSMF ¶ 67.)  Plaintiffs may sell, bequeath, lease, or develop the property in accordance with a new developer's agreement.  The Court agrees with Defendant that "Plaintiffs can do whatever they want to do with the property—except build it pursuant to the over 20-year-old developer's agreements and local land use approvals that the Borough voided."  (Mot. at 1.)

9

Plaintiffs further argue that they "have suffered a diminished value in the property" which is enough to constitute a regulatory taking. (Opp. at 31.) To support this argument, Plaintiffs rely on their expert report to show that they lost a profit of $12,976,275 as a result of Defendant's revocation of Plaintiffs' building permit and refusal to reissue the permit. (*Id.*; *see also* Ex. KK.) This calculation relies on their expert's assumption "that it would be reasonably probable for the property to be legally permissibly built" (ECF 130-10, "Ex. OO", Montferrat Dep., 30:22-25), including that the property "received approvals" as well as "amended approvals" from Defendant. (*Id.*, 32:9-12). Plaintiffs' argument in support of a regulatory taking, therefore, is not that the property has lost tangible, measurable value because of the Borough's actions, but rather that Plaintiffs "without being able to build the properties cannot obtain the profit." (Opp. at 32.)

The Supreme Court explained in *Penn Central* that "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law" and accordingly, the government "may execute laws or programs that adversely affect recognized economic values." *Penn Central*, 438 U.S. at 124. There, the Supreme Court wrote that the assertion that plaintiffs "may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable." *Id.* at 130. Therefore, "'a regulatory limitation on the right to use and receive profits from property will not necessarily or even usually establish that there has been a taking.'" *Pinewood Estates of Michigan v. Barnegat Township Leveling Bd.*, 898 F.2d 347, 351 (3d Cir. 1990) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982)).

Applying the *Penn Central* test, this Court finds that Defendant's actions do not amount to a taking under the Fifth Amendment. First, in assessing the economic impact of the regulation,

Plaintiffs do not provide a figure to demonstrate the diminution of the property's value since 2000; instead Plaintiffs rely on speculative claims of lost profits from being unable to develop the land in accordance with over twenty-year-old agreements. But "a taking does not occur merely because a regulation denies the owner of the most profitable use of the property." *Tulio v. Lansdale Borough*, 660 F. Supp. 3d 368, 381 (E.D. Pa. 2023). The taking must "effectively destroy [Plaintiffs'] property rights." *Pace Res. Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1033 (3rd Cir. 1987).

The second *Penn Central* factor does not weigh in Plaintiffs' favor either. Claims based on expectation interests are "fraught with the difficulty of determining whether the reduced expectation rises to the level of a taking." *Crow-New Jersey 23 Ltd. P'Ship v. Clinton*, 718 F. Supp. 378, 383 (D.N.J. 1989). Under the police power doctrine, the government may pass regulations to "protect the general health, safety and welfare of its citizens" without having to compensate the aggrieved. *Akins v. United States*, 82 Fed. Cl. 619, 622 (Fed. Cl. 2008) (internal quotations and citation omitted). Therefore, "distinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest." *Nekrilov*, 45 F.4th at 674-75. Plaintiffs have demonstrated that they invested millions of dollars into the development of the property, but it is not reasonable for Plaintiffs' investment-backed expectations to remain fixed over twenty years. The record also shows that during multiple year-long periods throughout this dispute, Plaintiffs did not consistently seek to develop the property, even when they gained an exemption from the Highlands Act and there was no stop work order in effect. The Borough has a legitimate interest in being able to modify its land use regulations during that period. (*See* Reply at 21.)

11

Finally, the character of the government action here does not support the finding of a taking. "[A] taking through an exercise of the police power occurs only when the regulation has nearly the same effect as the complete destruction of [the property] rights of the owner." *Pace Res. Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1033 (3rd Cir. 1987)) (internal citation and quotations omitted). Instructive here, when applying the *Penn Central* test, Judge Martinotti determined that allegations that plaintiffs were prevented from "developing their property" could not support a finding that their property interests were completely destroyed and, as a result, there could be no taking. *Acad. Hill, Inc. v. City of Lambertville*, No. 20-1618, 2021 WL 754092, at *6 (D.N.J. Feb. 26, 2021), *aff'd*, 2022 WL 1089187 (3d Cir. Apr. 12, 2022). Defendant has not prohibited Plaintiffs from exercising the panoply of their property rights, including selling or leasing the land, in addition to constructing on and developing it in any other fashion besides the agreed upon course in the Developer's Agreements. Thus, this Court cannot conclude that Plaintiffs' property rights have suffered complete destruction from Defendant's regulation.

Therefore, there has been no taking, and the Borough is entitled to summary judgment on Plaintiffs' Fifth Amendment claim. Defendant's motion as to Count I is **GRANTED**.

### B.  Fair Housing Act

Plaintiffs allege that ever since they secured approval to build Lakeside Manor townhomes as well as Mountain Lake Estates from the Wanaque Planning Board over twenty years ago, Defendant has "created obstacle after obstacle in order to prevent Plaintiffs from developing these 175 homes." (Opp. at 35.) Plaintiffs attribute the Borough's resistance to their development to Defendant's discrimination against them and their selected developers, based on their shared national origin. (*Id.*) Defendant argues Plaintiffs lack standing to bring this claim and that the Fair Housing Act does not apply in these circumstances. (Mot. at 43-47.)

### 1. Overview

Congress enacted the Fair Housing Act as Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3631 (1994), to prohibit housing discrimination on the basis of race, color, religion or national origin.  Section 3604(a) makes it unlawful to "refuse to sell or rent…***or otherwise make unavailable or deny***, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a) (emphasis added).  A violation of the Fair Housing Act may be established by showing that the challenged actions were either (i) motivated by intentional discrimination or (ii) resulted in a discriminatory effect, even absent evidence of a discriminatory motive.  *Doe v. City of Butler, Pennsylvania*, 892 F.2d 315, 323 (3d Cir. 1989).

Under the first theory, a plaintiff can establish intentional discrimination by showing that discriminatory intent against a protected group was a motivating factor for the challenged action. *Edouard v. City of Long Branch,* No. 17-03582, 2022 WL 4586420, at *4 (D.N.J. Sept. 29, 2022). Determining "whether invidious discriminatory purpose was a *motivating factor* demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[3] *Village of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 266 (1977) (emphasis added) ("*Arlington Heights I*").  To establish liability under the discriminatory effect theory, a plaintiff must establish a *prima facie* case that the challenged action has a discriminatory effect on a protected class.  *Rizzo*, 564 F.2d at 148.  Once a *prima facie* case of discriminatory effect has been established, a court must determine whether a defendant can justify its challenged conduct.

---

[3] To find discriminatory intent, courts must consider the following factors: (i) discriminatory impact of the challenged practice or policy; (ii) the historical background of the challenged decision; (iii) the "sequence of events leading up to the challenged decisions;" (iv) departures from "normal procedural sequences;" (v) departures from normal substantive criteria; and (vi) legislative or administrative history of the challenged decision.  *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 143 (3d Cir. 1977) (citing *Arlington Heights I*, 429 U.S. at 265).

*Id*. A defendant must establish that the stated justifications serve "in theory and practice, a legitimate, bona fide interest" and "that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Id*. at 149.

### 2. Standing

Under the Fair Housing Act, an "aggrieved person" may commence a civil action to obtain relief from an alleged discriminatory housing practice. 42 U.S.C. § 3613(a). The Fair Housing Act defines an aggrieved person to include any person who "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). The Supreme Court has broadly construed the standing requirements under the Fair Housing Act, ruling that the "sole requirement" is the Article III criteria. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982); *see Trafficante v. Metro. Life Ins. Co*., 409 U.S. 205, 209 (1972).

Furthermore, the Supreme Court has specifically held that a plaintiff need not be a member of a protected class to bring suit under the Fair Housing Act, so long as the plaintiff suffered an actual injury due to defendant's alleged discriminatory conduct. *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103 n.9 (1979) (finding that plaintiffs suffered a "distinct and palpable injury" as a result of racial animus which was sufficient to confer standing in spite of fact that plaintiffs were not the targets of the discrimination).

Relying on the Supreme Court's broad construction of standing under the Fair Housing Act, the Third Circuit has held that standing will be conferred where a non-protected class member's plans to develop housing for a protected class member are thwarted by an allegedly discriminatory practice. *See Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1100 n.2 (3d Cir. 1996) (citations omitted); *Growth Horizons, Inc. v. Delaware County, Pennsylvania*, 983 F.2d

1277, 1282 (3d Cir. 1993) (Under the FHAA, "'an aggrieved person' does not necessarily have to be the person discriminated against."). In *Growth Horizons*, the Third Circuit concluded that a corporation providing residential placements for mentally disabled individuals had standing to sue because the corporation alleged that it suffered economic injury because of discriminatory animus towards disabled people. 983 F.2d at 1282. Likewise, in *Hovsons* a nursing home developer was granted standing to raise claims on behalf of unidentified plaintiffs who would have resided in the proposed facility. 89 F.3d at 1100 n. 2; *see also Kessler Inst. for Rehabilitation, Inc. v. Mayor and Council of Essex Fells*, 876 F. Supp. 641, 651-52 (D.N.J. 1995) (holding that property owners have standing under the Fair Housing Act when their properties were directly targeted by an alleged discriminatory housing practice against protected class members).

In *Eastampton Center L.L.C. v. Township of Eastampton*, the district court found that plaintiffs who were non-protected class members met the standing requirements under the Fair Housing Act where their plans to develop residential housing were frustrated by the Township's alleged discrimination against families with children. 155 F. Supp. 2d 102, 115 (D.N.J. 2001). There, the Court held that "[a]ccording to the Third Circuit cases, Plaintiffs' inability to build residential developments due to the Township's revised zoning ordinances, is an economic injury that constitutes an injury in fact for standing purposes." *Id.* Moreover, the court found that plaintiffs' economic injury was traceable to the Township's adoption of new zoning ordinances allegedly motivated by an intent to exclude or reduce housing options available to families with children, and that a decision in plaintiffs' favor would remedy their economic injury, which was sufficient to satisfy the second and third redressability prong of constitutional standing. *Id.*

Similarly, Plaintiffs' economic injury here is an alleged result of Defendant's intent to

discriminate against immigrants of Portuguese descent.[4]  (*See* Opp. at 37.)  Plaintiffs are non-protected class members—like in *Hovsons*, *Growth Horizons*, *Kessler*, and *Eastampton*—and allege that Defendant's actions[5] stymied Plaintiffs' ability to develop the land in question.  (Opp. at 12.)  Defendants argue that Plaintiffs lack standing because Plaintiffs do not intend to live on the property after developing it as a commercial venture (Mot. at 45), but the Fair Housing Act contains no such requirement, and this Circuit has interpreted the Act to permit broad assertions of third-party standing by owners and developers on behalf of protected class members.  *See Hovsons*, 89 F.3d 1096, 1100 (3d Cir. 1996).  Indeed, "standing will be conferred where a non-protected class member's plans to develop housing for a protected class member are thwarted by an allegedly discriminatory practice." *Eastampton*, 155 F. Supp. 2d at 114.

Defendants contend that Plaintiffs have made no allegations regarding the characteristics of the prospective residents of the proposed development, which distinguishes this case from the cases relied on by Plaintiffs, including *Hovsons* and *Eastampton*.  (Reply at 23.)  In finding standing, the *Eastampton* court noted "several differences" between the plaintiffs in *Hovsons* and *Growth Horizons*, who were building housing specifically for protected class members, and the

---

[4] Plaintiff companies are owned by a Portuguese immigrant, Mr. Rodrigues, and the company that Plaintiffs contracted with to develop the land, J&J Builders, is also owned by an immigrant from Portugal, Jose Gomes.  (Compl. ¶ 83.)  The Borough of Wanaque's Administrator, Thomas Carroll, is alleged to have said to Mr. Rodrigues: "We don't want this guy [Gomes] to build the project, and the Town doesn't want you. Sell the project. Get somebody else.  We are not—we don't want you or your Portuguese friends to come and build the project in Wanaque. You're not welcome."  (Rodr. Dep., 81:19-82:9.)

[5] After Mr. Carroll is alleged to have made the above statements, the Borough (1) enacted a resolution terminating the designation of the redeveloper of Lakeside Manor, (2) refused to assign the Developer's Agreements to J&J Builders, and (3) introduced Ordinance 3-0-17 that proposed a redevelopment plan that "would wipe out all of Plaintiffs' rights to the project, declar[e] the property abandoned, demolish[] all improvements constructed to date" and refer the redevelopment plan to the Wanaque Planning Board for a hearing.  (*Id.* ¶ 25; Opp. at 9 (citing ECF 130-8, "Ex. FF").)

plaintiffs in *Eastampton*, where "the record [did] not indicate that Plaintiffs' development plans were intended specifically to benefit families with children or any other protected class." 155 F. Supp. 2d at 115 n.13. The court there held that "[n]otwithstanding these distinctions, the Court is constrained to confer standing under the Fair Housing Act given the broad reading adopted by the Supreme Court and Third Circuit." *Id.* In so finding, the court relied on "the Supreme Court decisions which broadly construed the standing requirements to promote the purpose of the Fair Housing Act" including "to prevent discriminatory racial animus in housing practices, and to promote the important goal of 'stable, racially integrated housing.'" *Id.* (quoting *Gladstone*, 441 U.S. at 111). Similarly, this Court is compelled to confer standing under the Fair Housing Act where Plaintiffs have sufficiently alleged that discriminatory intent against a protected class was a motivating factor for the challenged action.

### 3. Plaintiffs' Claim

The Court must determine whether a genuine issue of material fact exists as to Plaintiffs' claim under the Fair Housing Act. Plaintiffs seek to demonstrate a violation of the Act under the intentional discrimination prong, but argue in addition that Defendant's actions have had a discriminatory effect absent discriminatory motive under the second theory. (Opp. at 36.)

To establish a claim under the first theory, "[t]he discriminatory purpose need not be malicious or invidious, nor need it figure in solely, primarily, or even predominantly into the motivation behind the challenged action .... The plaintiff is only required to show that a protected characteristic played a role in the defendant's decision to treat [him or her] differently." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005) (internal citations and quotations omitted). Plaintiffs are therefore "only required to show that a protected characteristic played a role in the defendant's decision to treat [them] differently." *Id.* (quoting *Cmty. Hous. Tr.*

*v. Dep't of Consumer & Regul. Affs.*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)).

By this Circuit's standard, Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to Defendant's discriminatory intent.  In his deposition, Mr. Rodrigues testified that "from Day 1" the Borough gave him "a hard time every opportunity they had."  (Rodr. Dep., 81:19-82:9.)  The Borough directed Plaintiffs to sell the project to another, non-immigrant buyer and offered economic incentives to other buyers, including a bond for $1.85 million, that were never offered to Plaintiffs.  (See Rodrigues Cert., ¶ 18; *see* Carroll Dep., 101:1-103:25; 106:10-107:25).   Most notably, after Plaintiffs contracted with J&J Builders, the Borough Administrator told Mr. Rodrigues: "We don't want this guy [Gomes] to build the project, and the Town doesn't want you. Sell the project. Get somebody else.  We are not—we don't want you or your Portuguese friends to come and build the project in Wanaque. You're not welcome." (Rodrigues Cert. ¶ 24.)  Mr. Gomes, like Mr. Rodrigues, is an immigrant from Portugal.  (Compl. ¶ 90.)  Defendant refused to assign the Developer's Agreements to J&J Builders, who eventually cancelled their contract with Plaintiffs on April 3, 2017.  (*Id.* ¶ 93.)

Taking as true all of Plaintiffs' factual averments, the Court finds that there are sufficient facts in dispute for Plaintiffs' Fair Housing Act claim to survive a motion for summary judgment under  an intentional discrimination theory of liability.   The Court will  therefore  not  address Plaintiffs' claim under the discriminatory effect theory.  The Court takes no position on the sufficiency of Plaintiffs' claim under this second theory.   And because it is Defendant, not Plaintiffs, moving for summary judgment, the Court need not determine whether Plaintiffs have established each element of their claim under either theory.

Defendant argues that it is entitled to summary judgment on this claim because "the Act does not apply to the sale of residential property to a person who is buying the property as a

18

commercial venture, has no intention of residing in the property, and is not suing on behalf of protected class members who would reside there." (Opp. at 46.) However, Defendant cites to out-of-circuit precedent to support this contention. *See id.* (citing *Patel v. Holley House Motels*, 483 F. Supp. 374, 381 (S.D. Ala. 1979); *Matsunaga v. Century 21 Stanmeyer Realtors*, No. 84-11018, 1985 WL 1113 (N.D. Ill. May 7, 1985)). As discussed *supra*, commercial entities such as brokers and developers can bring claims under the Fair Housing Act on behalf of protected class members where there are allegations of discriminatory intent or effect. *See Gladstone*, 441 U.S. at 103; *Hovsons*, 89 F.3d at 1100.

Based on the foregoing, the Court finds that there is a genuine issue of material fact in dispute related to Plaintiffs' Fair Housing Act claim, and Defendant's motion for summary judgment as to Count II is **DENIED**.

### C.  Section 1982

Defendant moves for entry of summary judgment as to Plaintiffs' claim for deprivation of housing rights under 42 U.S.C. § 1982 ("Section 1982"). Plaintiffs maintain that Defendant deprived them of their property rights "due to the principal of the Plaintiffs [J&J Builders] being perceived as non-white." (Opp. at 40.) Plaintiffs point to specific "heritage-based distinctions made by Mr. Carroll" which they argue "amount to racial epithets that evidence race-based discrimination and othering" and create a cognizable claim under Section 1982.[6] (*Id.*)

Section 1982 of the Civil Rights Act provides that all citizens "shall have the same right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

---

[6] These "heritage-based distinctions" are the same comments made by Mr. Carroll that create a genuine dispute of material fact for Plaintiff's Fair Housing Act claim, *i.e.* "we don't want you or your Portuguese friends to come and build the project in Wanaque" as well as Mr. Carroll's statement that "[i]t takes a lot to get his Irishman pissed." (Rodr. Dep., 81:19-82:9; ECF 130-8,

This statute also seeks to effectuate the aims of the Thirteenth and Fourteenth Amendments of the Constitution and generally "prohibits racial discrimination in transactions relating to real and personal property." *Brown v. Phillip Morris Inc*, 250 F.3d 789, 797 (3d Cir. 2001). To prevail on their Section 1982 claim, Plaintiffs must prove (1) Defendant's racial animus, (2) intentional discrimination, and (3) that Defendant deprived Plaintiffs of a property right under the statute because of race. *Id.*; *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616 (1987).

But Section 1982 "is not a comprehensive open housing law" like the Fair Housing Act, which explicitly includes national origin as a protected class. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968). As the Supreme Court held in *Jones*, Section 1982 applies only to discrimination based on race, and not to other forms of discrimination prohibited by subsequent Civil Rights Acts. *Id.* ("[Section 1982] deals only with racial discrimination and ***does not address itself to discrimination on grounds of religion or national origin***.") (emphasis added).

While Plaintiffs argue that a genuine dispute of material fact exists as to whether the Borough intentionally discriminated against them based on the perception of Plaintiffs' proposed developer as non-white, in their brief Plaintiffs describe the oral and written statements made by the Borough's Administrator as "heritage-based distinctions[.]" (Opp. at 40.) The only evidence that Plaintiffs can identify to prove Defendant's racial animus is premised upon J&J Builder's Portuguese heritage, which is not a cognizable form of discrimination under Section 1982. *See Miller v. Apartments & Homes of New Jersey, Inc.*, 646 F.2d 101, 110 (3d Cir. 1981) ("section 1982 does not prohibit discrimination based on sex, religion or national origin."); *see also Petrone v. City of Reading*, 541 F. Supp. 735, 739 (E.D. Pa. 1982) (dismissing plaintiff's Section 1982

---

"Ex. BB".) The Court holds that no reasonable juror could find that the latter statement made by Mr. Carroll referring to himself as an 'Irishman' is evidence of any form of discrimination.

claims which were predicated upon heritage).  Plaintiffs provide no other evidence to indicate that they were discriminated against because of race.[7]

Therefore, Plaintiffs' Section 1982 claim predicated upon J&J Builder's Portuguese heritage is deficient, and summary judgment is **GRANTED** in Defendant's favor on Count III.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment (ECF 123) is **GRANTED** in part and **DENIED** in part.  An appropriate order follows.

*/s/ Jamel K. Semper*

HON. JAMEL K. SEMPER

**United States District Judge**

Orig:  Clerk
cc:    Leda D. Wettre, U.S.M.J.
       Parties

---

[7] Though Plaintiffs argue in opposition that Borough officials made Mr. Rodrigues feel inferior because he was not from Wanaque but from Newark, and that this is evidence of Defendant's intent to discriminate against "non-white outsiders," the Court finds this argument unavailing because the allegation of geographical bias is far too attenuated from race-based discrimination. (Opp. at 40 (citing Rodrigues Cert., ¶ 23).)